And we'll call our next case, Case 23-4047, Behavioral Medicine Consulting v. CHG Companies. Okay, Mr. Barnack, proceed. Thank you, good morning. May it please the Court, Matthew Barnack for the appellant, whom I'll refer to collectively as Dr. Brown. And my intent is to- Oh, yes, I thought I was. I'm sorry. That thing will raise up. Okay, I'm not sure. Oh, there. All right, is that better? Can you hear me? Okay. Thank you. My intent is to defer five minutes for rebuttal. In this case, we seek reversal of the trial court's summary judgment motion, both for genuine issues of fact and because of a misinterpretation of the professional services agreement. The issues of fact really fall into three categories, and the first one is facts that question whether the comp health made a reasonable determination as the contract requires before canceling the placement. There is testimony in the record that the trial court rejected that Dr. Brown, in fact, had four sources of recent inpatient experience, meaning within the last 24 months, that qualified him under their own credentialing standards. That was in the record. Was it in your initial summary judgment response? It was in the briefing, in the hearing, and the trial judge's decision actually reflects that those arguments were made and preserved. Were the underlying facts the additional experience of the doctor inpatient? That was in the record and in the papers filed in opposing summary judgment. That was in the record beginning at the hearing. The judge asked a question that... What were you referring to that was in the record and in the papers filed in the summary judgment proceeding? Okay, I misspoke. On that point, there wasn't anything in the papers because that's an issue, it was a refinement of the issue that only came up when the judge asked the question at the hearing. It was in the record, but you didn't argue it. I did argue it. You didn't argue it in the paper. Yes, I argued it at the hearing, and what I want the court to understand is no one had raised that issue. We hadn't anticipated the court might refine the argument that way, and the judge said, well, it's one thing to have a credentialing standard that's unreasonable. Your opposing counsel raised the issue because they said your client had no inpatient experience in the past two years, right? I think that was their argument, yes. But you didn't come forward at that time in the summary judgment briefing with actual evidence that he had had inpatient experience in the past two years. So, I mean, my point is, it did come up in the briefing because that was the whole point of the summary judgment motion. Well, our argument in the summary judgment opposition was that the standard itself is unreasonable, and then that issue got refined at the argument, and we said, oh, yes, there is evidence in the record that shows he, in fact, had the qualifying inpatient experience. The judge asked for it. I presented it. We understand that. We're asking different questions. Let me ask you, is the application that was submitted on July 8th by your client to CompHealth, is that in the record? I'm not certain. I assume it is, but I don't know that I attached it to my briefing. What was in that application? I mean, didn't they ask for his background and experience? I think generally, yes. I don't know if that called for his resume or not. I honestly can't recall the specifics of that application, but I can tell the court that CompHealth had his resume on June 18th, and it had two sources of... Wait a minute. June 18th. I thought the application was not made until July. That's correct, but they had his resume on June 18th, which had two sources of inpatient experience. They asked for an updated resume. Is that CV in the record? Yes, it is. And is there anything in the record that indicated how and why they had that? Because he hadn't applied yet. Well, yes, what's in the record is Preston Powell sought him out. They found Dr. Brown in a database of providers. Western did. No, no, not Western. CompHealth did. Okay. And is the record clear that at that time they had that CV? Yes. Yes, Preston Powell in an e-mail that's attached to our briefing, and I'm confident we quoted it saying, I have your CV. That was an e-mail on June 18th. And they asked later for an updated CV, which he provided, and that included two more sources of inpatient experience. When did they ask for the updated CV? I want to say that was around the 8th, 9th, 10th of July. Well, that could be important. The application was made on the 8th of July. Yeah, I assume so. I don't recall that specifically. So are you telling me that from the CVs they had, the earlier June CV, and the updated one from July 8th, that they had that in their possession when they rejected him on a credential basis on the 12th of July because of lack of sufficient inpatient? That is correct, absolutely. They had it all, and that part, I think, is not disputed. Does the record indicate that he had any opportunity to have a colloquy with them about this right about the time when they rejected his credentials and canceled the assignment to Western? Yes, the record indicates there was no conversation. The Comp Health's 30B6 witness testified. Did your client do anything to generate a colloquy with Comp Health? No, because he understood credentialing had taken place when they recommended him to Western State on June 28th. Okay, but something went haywire on the 12th, is that they rejected him on credentialing. So after he was rejected, did he try to initiate a colloquy with them about this? Yes, absolutely. And the record indicates that? The record indicates that. He asked Preston Powell. He said, I can't do it. My supervisor, whose name I'm forgetting. Did you include that in your papers when you were briefing the bad faith issue or the interference issue? I believe we did. I can't give you a record citation. In the papers, I believe we did, yes. Did you argue it orally at the argument in front of the judge, the district judge? I don't recall if that question came up at the hearing. I don't recall that, Your Honor. But it was Autumn Rich was the supervisor's name, and that conversation, I'm confident, is in the briefing. Judge Moritz has a question. Yes, sorry, Judge Moritz. Yeah, I'm trying to get some clarification here, because I want to make sure that we're talking about the same thing. You said that your original position in your pleadings or in your briefings is that their standard, their actual credentials were unreasonable. But then at the oral argument, you realized the judge wanted to talk about the actual application of those standards, and that's when you argued, well, yes, he did have some inpatient experience. And I guess what I want to know is on that inpatient experience that you were relying on at the hearing and now, was that standard inpatient experience, or were you talking about the equivalent of inpatient experience? Were you saying, well, okay, he wasn't actually in a inpatient setting, which is what the credential apparently required, and he worked in an inpatient setting, but he had this telehealth experience, and so that was essentially the equivalent of an inpatient setting. Do you see what I'm saying? I do see what you're saying. Go ahead. I'm sorry. Okay, because it seems important to me, because if you're still arguing, gee, no, he wasn't in an inpatient setting, but we think this was the equivalent, you're still really arguing about the reasonableness or unreasonableness of their credentials. And so I'm trying to clarify if his actual experience that you're now relying on is inpatient setting, in an inpatient setting experience versus telehealth. Yes, it is. And the record citation on the appeal is page 473 of the appendix. Dr. Holmberg's report, our expert, and, for example, Great Rivers, Dr. Brown reviewed inpatient medical records and participated in inpatient plan of care meetings in hospitals. In the U.S. Air Force Reserve, he worked and consisted of seeing patients, many of which were not in inpatient settings, but many of which were. The community health plan, he was reviews of inpatient care. Is there a record at 473? It is. Let me ask you this. That is when the litigation is underway. Was that articulation of his inpatient experience evident expressly  and it was updated on or about the 10th of July? I believe so. Is that the CV you're looking at? That's the CV I'm looking at. What does it say about those positions? So medical director of Pacific Team, that one was telemedicine, we know, but it was medication management, interdisciplinary case conferences. Great Rivers, he supervised clinical staff, inpatient utilization management. I mean, there's enough description here to at least ask the question. What does that mean, inpatient utilization management? I don't know specifically, but my point is that there's enough here to say, were you inpatient or not? And they didn't even ask the question. They didn't even consider the other three sources. That CV is in our record. It is. Was it in the record when the argument on summary judgment was had? Yes. And was it referenced in your papers? It was referenced in the papers, the CV, the specific sources of inpatient experience. I don't think were addressed in the papers in any detail. Because, again, that came up because of the judge's question. And that's my concern here that I want the court to understand. The judge asks a question. I give the information, but the judge then either forgets about it or ignores it. But she addresses it in her ruling. We get it. We get your idea. And I get that there's a lot for a trial judge to keep track of. I'm not trying to ask something unreasonable. Is the supplement to the CV was in the record and referenced in your papers in the summary judgment proceedings? It was. It was document 61-5 in the trial court. It's page 1461 here. Now, I haven't dug into the records sufficiently to look at the papers that were filed on summary judgment. Was there a separate paper or a prefatory piece in both parties filing about undisputed facts? Yes. Yeah, those were. And did you include that in your recitation of undisputed facts, the CVs? I'm confident I did. I can't give you a page citation. Well, actually, I can. It's 61-5. Okay. And in your argument section, was it referenced in the summary judgment papers? In our argument section, I don't know if the CV specifically was referenced. I don't know. And I understand how that interplays with your argument, that things happened at the argument. Yes. All right. Well, I guess I do want to confirm that the judge was not incorrect, though, was she, that your written argument in your response to summary judgment focused on the fact that he had essentially the equivalent of inpatient experience, that he had telehealth experience, and that essentially you were challenging the reasonableness of their inpatient setting requirement, which you're not allowed to do under the contract. You can challenge the application, but not the credentialing requirements themselves. Isn't that the case? Your focus at that time wasn't on what you're now focusing on, but on essentially whether they should be requiring actual in-hospital experience. That's correct, and that's the reason for the judge's question at the hearing. Right. And that's the reason the judge said, well, I'm going to find that you weighed this argument you're making now. Even if there were essentially records to support it, she said, look, that's not the argument you're making. Actually, she didn't say we weighed it. What she said in her decision was that Dr. Holmberg's opinion really questions the reasonableness of the standard and doesn't provide any real information about actual inpatient experience. That's what she ruled, and that's where it's incorrect. That's true, isn't it? That's true, isn't it? She wasn't wrong about that, was she? No, she was wrong. Dr. Holmberg's opinion talks about both the unreasonableness of the standard and that he had several sources of inpatient experience and what they consisted of. Okay. So that's what we believe she misapprehended was what's in the report. She was right about your argument, but she was wrong about the underlying facts. You're saying you did argue the reasonableness aspects. Absolutely argued that, yeah. And that occurred in the Rule 56 proceedings, not the Rule 59 proceedings. That was at the Rule 56 hearing, yes, yes. And then she addressed it in the decision, and what's significant there, I know I'm out of town, but if I can finish this thought, what's significant there is that in her decision, she actually discussed Dr. Holmberg's report and said what she thought it included or not included. She would have to have read that report to make that statement. So we know it was conveyed to her, she understood it, she read the report, made a decision which we disagree with, but there's no question that she knew what was in that report. And that occurred in the Rule 56 proceedings. It did, it did. Okay, thank you, Counsel. You're out of time. Thank you. May it please the Court, Rick Enzer on behalf of CHG Companies, Inc., DBA as CompHealth. Let me start by whether or not this issue we're dealing with on the reasonableness of the determination on credentialing and being able to ensure was fairly presented to the district court. The answer is that it was not. The first cause of action in the complaint raised by Dr. Brown asserts it's called breach of contract, semicolon breach of implied faith in good dealing. So there's not a lot of clarity from the caption of the first cause of action. So what CompHealth did was we filed a summary judgment motion moving on both express contract terms and moving on the breach of good faith in fair dealing. And in response to CompHealth's motion on summary judgment motion for dismissal of any claims relating to the breach of an express contract term, Dr. Brown did not respond at all. He solely responded with the arguments about the breach of the implied covenant of good faith in fair dealing. And so after he filed his opposition, not focusing on the express contract terms, focusing on the breach of good faith in fair dealing, which really gets to Judge Moritz's point that it was really focused on whether or not this procedure is unreasonable as a whole, CompHealth filed a reply brief saying there is no argument raised that there's any breach in the express contract term and therefore summary judgment should be granted on the express contract terms. Dr. Brown was provided with the opportunity for a reply and once again a surreply. A reply? Yes. To your reply? Yes, Your Honor. A surreply. All right. And that occurs during oral argument, doesn't it? He actually was provided with the opportunity to provide a written surreply. What do you mean? What, did the judge issue an order saying you can do a surreply? Yes, Your Honor. There's an order that says and you can do this? Correct. Judge Parris said, yeah, you can file a short, I think it was under five pages. He must have asked to be able to do that. He did, Your Honor. Okay. And in that surreply, again, Dr. Brown does not focus on the express contract terms. The first heading, again, is called breach of the implied covenant of good faith and fair dealing. I understand. Let me ask you this. But it sounds like at the oral argument that there was a consideration by the district judge about the application of the standards. And at that time, the plaintiff's lawyer got engaged and was talking about these other things on his inpatient experience, correct? Isn't that what oral argument is meant for? You have all the papers. That's all completed. And oral argument is to explore this. So they explored it. And then in the Rule 59, the judge said, well, that was too late. Your Honor, I think it's fair to say oral argument serves a variety of purposes, including to explore the party's position and the test and probe. But there are obligations in the briefing to cite evidence with specificity in response to undisputed facts that are asserted by the moving party. And the court and Judge Parrish was not obligated to go through the record and try to find out what Dr. Brown was talking about during an oral argument. But in oral argument, that generates that colloquy between the judge and the lawyer. And that's when this whole thing came out. So there was engagement there. And shouldn't there be a purpose for that engagement and consequences to it? Your Honor, there certainly should be purposes and consequences to oral argument. But arguments not addressed in the brief can be considered waived. And facts not disputed or disputed with evidence that doesn't support the argument, that's insufficient under Rule 56 to establish a disputed fact. Well, when you take it a step further, OK, I understand your point that the judge is kind of wondering what's going on here. Now, this is a little different than what I expected. And then she rules against the plaintiff on summary judgment and issues a summary judgment. And then there's a Rule 59 proceeding. Now, isn't that a second opportunity to reengage on this so that fairness is done and proper claims are acknowledged? Yes, Your Honor, that's correct. I think the district court felt— And in that proceeding, the judge said, too late. He didn't engage me on it in the Rule 56 proceedings. And you can't do so now. That's correct, Your Honor. What are the limits of the Rule 59 proceeding? I mean, you don't get to relitigate everything in a Rule 59 proceeding. So what do you get to do in a Rule 59 proceeding? Your Honor, it's fairly limited. And in this case, I think Rule 59 would be limited to whether or not the judge made an error of law or misunderstood a certain fact, Your Honor. It's a fairly narrow scope of review at that point. But to go back to Judge Murphy's point, if I may, Judge Carson, I think the district court was in her right to say, you raised a point, an oral argument that I had never seen in your opposition. I had not seen in your written reply. I had never seen the term specific teen once in any of the written documents. I had never seen the facility Great Rivers in any of the written documents. I had never seen this alleged argument that the Air Force Reserves provided this sort of inpatient facility. I think the court's within her right to say, you never cited me to that at a single point. And therefore, I'm not going to go parse the records now. And really, if you look at a couple of things on this point, Judge, Statement of Fact Number 13 is really, in my motion, in Comp Health's motion, is really where this issue was brought to a head. What are you referring to again? It's Statement of Fact 13. My proposed Statement of Fact Number 13 for my 56 motion. Appendix 260 and 261. That's where Dr. Brown responds to my assertion, to Comp Health's assertion that this, he was uninsurable and he could not be credentialed, and so he was properly canceled. And in that, in response to that, you don't see the references to Pacific Team, Great Rivers, the Air Force Reserve. What you see is what some of the question is already focused on. You see an answer from Dr. Brown saying a couple of different things. Says, well, Comp Health's inpatient experience is unreasonable. Requiring inpatient experience is unreasonable. That's one thing Dr. Brown says. He says psychiatrists frequently change jobs. They go back and forth. And so you can't have this inpatient requirement. It doesn't make any sense. He says telemedicine really can be inpatient medicine. They shouldn't view telemedicine as not being inpatient medicine. And then Dr. Brown complains that the way Comp Health uses the term credentialed is vague and unclear and was ambiguous to him. So when the issue was brought to the front in the written papers, Dr. Brown doesn't respond with any of the evidence that he's repeatedly cited in this court about these different assignments. Let me ask this. Would it be fair to say that Dr. Brown did so, however, at the oral argument in the Rule 56 proceedings? It would be fair that Dr. Brown brought up those assignments at oral argument in the Rule 56 proceedings. They were referenced, Your Honor. Not highlighted at length, but they certainly were referenced. And were those – are your credentials, the actual inpatient setting requirement that I've seen referred to in all the briefing, are the credentials, the actual wording, somewhere written in the record? They are not, Your Honor. The testimony from a variety of CHG employees were – set forth what they were looking for in this case was some inpatient experience. But there was some suggestion that there maybe weren't even any written credentialing requirements. I think there was a footnote in Dr. Brown's brief suggesting not sure if there was even any written credentialing requirements. Is that true? Your Honor, what I can tell you is no written credential requirements were produced in the case. Well, you said that comp health employees testified about it. In their testimony about it, did they talk about a written set of credentials? I believe it was referenced, Your Honor. That there were written credentials? I believe that's correct, Your Honor. Okay. Do you have a witness? Can you give us a witness name? Stephanie Cottle, I believe, referenced that, as did the primary – the 30B6 witness. I thought Stephanie Cottle actually testified that she never even got a chance to apply – essentially apply the credentials to Dr. Brown's CV or to his qualifications because she was instructed by somebody above her that he didn't meet the credentials. So the process never actually even happened. Is that right? No, I don't think that's quite right. If you look at – excuse me, I forget his name. The main individual – sorry, Powell, Preston Powell's testimony. Preston Powell? Yeah, if you look at the collective testimony, Your Honor, of Preston Powell, the 30B6 witness, and Stephanie Cottle, it was clear they were trying to get him credentialed. They were going through the process. There is this two-year requirement that even when Dr. Brown provided his updated CV, they still didn't meet the inpatient criteria, Your Honor. I guess it's just – it's hard for me to make a distinction between a reasonableness argument and an application argument, which is what the district court did, when no one seems to even know exactly what the credentials required. Did they require – did they say you must be in an inpatient setting? Did they require the equivalent of an inpatient setting? It's odd to me that no one has ever set out what exactly the credentials required, and it seems to me maybe that's part of the problem and why the argument was, well, your interpretation of whatever they are doesn't seem reasonable, or your application doesn't seem reasonable. It's as though it all blended into one. It seems hard for us to review the application of these credentials, but we don't even have the credential or any definition or how they viewed whatever the requirement was. What is inpatient, an inpatient setting? Is that what the credential is? How much do you have to have? Is it two full years or is it two days or what is it? Well, Your Honor, I think the testimony is clear that there needs to be some experience in an inpatient facility within two years, and while it was not – But how much? How much? Your Honor, I don't know the answer to that off the top of my head, but the – Isn't that kind of important? I mean, if you're going to say he's not credentialed because he doesn't have inpatient experience, it's pretty important to know if one day is enough or one year or what. Your Honor, I think the answer to that is whatever it is for CAC's credentialing and insurance policy department to get comfortable. I mean, they're placing a physician at a facility of a client, and they need to have confidence that the doctor has the right experience and that the provider can be insured. No, the doctor's part of this contract, too. The doctor's part of the contract, too. Doesn't he have a right to know what the credentials are? And I maybe don't. Obviously, no one else is complaining that the credentials that we're all talking about aren't even part of the record, but it struck me as odd. Thank you for your question, Your Honor. If I may address one slightly separate – Wait, wait, wait. Let's continue on down this pathway. Who is the witness who, on the 12th of July, said, you're finished, we're going to reject you on credentials, and we're going to cancel the assignment to Western? Preston Powell, Your Honor. Okay, that was Powell. And he was the designated witness for what? He was not the 30B6. He was the relationship manager with Dr. Brown. Okay, let me ask you this. Is the record indicate that Powell had the CV from June in the supplemental CV? It does, Your Honor. It does. And he had the application of July 8th. Correct, Your Honor. And the PSA was signed after Powell and the company's receipt of the CV and the application. Then the PSA was signed two days later, correct? Correct, Your Honor. And then one day later, there was an assignment of Dr. Brown to Western, correct? I would have to double check, Your Honor, but that sounds correct. And then another day later, all of a sudden, he's rejected on the basis of credentials. Is that correct? That's correct, Your Honor. Is there anything involved with good faith of a person with whom Comp Health has a PSA contract to engage the doctor who's the subject of that CV, who's the subject of the application, who's the subject of the supplemental CV? Is there any requirement of good faith for them to engage this person? Your Honor, I would say factually the record reflects they did. Dr. Brown was very curt with Preston Powell once he was informed that he was not getting this assignment. Wait a minute. I mean, no, I'm talking about before they say you're not getting the assignment. Before they just canceled the assignment, was there any attempt to engage Dr. Brown before? Let me answer that twofold. One, they got an updated resume in an effort to try to find something that would satisfy the inpatient experience requirement. While this was going on, they were trying. But to answer your question directly, no, there was not a conversation prior to the call where Dr. Brown was informed. Do you think good faith suggests that would have been an appropriate thing to do? Your Honor, I think the doctrine of good faith and fair dealing under Utah law is fairly limited under the Young Living case. I know that. I was the trial judge in the Olympic Hills case. Okay. And I understand it fully. But there is situations where there is an implied duty of good faith and fair dealing, even in Utah, correct? Of course, Your Honor. It's just very limited. Why? Tell me why Utah law says that there is no obligation of good faith under the factual scenario that I gave you, which is not hypothetical. It's what happened in this case. Because the contract, the doctrine of good faith and fair dealing, will apply additional terms to a contract that are not in there. They'll apply additional terms to a contract that only if it is something the parties didn't think about and everyone, if they had ever thought about it, would have written that term into it, would have implied that term into it. Isn't there a lot of things that the parties hadn't thought about when there's maybe confusion about what the background experience was from the CV, from the supplemental CV, from the application? How does that fit into the Utah law that you just told me about? Judge, I don't think it does. And why? Because that would be adding terms to the contract through the implied covenant, which is very narrowly done in Utah. Well, it seems to me that maybe it's considering how to apply the terms of the contract, and that is the credentialing. Your Honor, to the extent there should be a conversation or a discussion going on between the provider and CompHealth, that would be in any sort of requirement. Providing provider meaning Dr. Brown? Correct. Yeah, between Dr. Brown. I absolutely agree with you. It should be part of the conversation. What I'm saying, Your Honor, is that would be adding a term to the contract, which under Utah law wouldn't be added. What term is it adding to the contract? What's the term that's not in the contract, the PSA, that it would be adding? That CompHealth shall reach out to Dr. Brown upon a determination that he cannot meet credentialing standards or insurance standards and have a conversation to discuss that. Isn't it inherent in their invocation of their cancellation powers? Isn't it inherent that they have some colloquy? It is not, Your Honor. Whether it's a good idea to do that or not, it's not in the contract, and it shouldn't be implied by the Doctrine of Good Faith and Fair Deal. So if there's no obligation to do that, there's really no reason to have an application. There's no reason to receive a CV. There's no reason to receive a supplemental CV, correct? Well, I disagree with that, Your Honor. That would get me to my last point, if I could pivot just a touch. Why don't you answer? You're way over time. Go ahead and answer his question, and then we're going to shut it down and give your opposing counsel a couple of minutes since we're so far over. Fair enough, Judge. Thank you. There's a variety. The CV and the application and the contract process are all part of bringing together the CHG, the provider, and the hospital. And there are three different ways that an assignment can be terminated. If it's terminated under Section 4.1 for insurance or credentials, there's no liability or no insurance, no liability, and you don't have to provide any notice. But under Section 4.4, which is if he's terminated, there's two provisions there. One is you can terminate with 30 days' notice for any reason. Terminate for any reason with 30 days' notice under Section 4.4. And if you don't terminate with 30 days' notice under Section 4.4, then there's an agreed-upon compensation structure. So to answer the court's point, I mean, there's a lot of reasons why you have to go through the process of lining up the hospital, the provider, and CHG all together through these documents and these CVs. But when it comes to the termination, there's 4.1, which is without notice, without liability. But if it's not under 4.1, then you fall to 4.4, which is you don't need notice. Sorry, it's with 30 days' notice, you can terminate anything. And if it's under 30 days, then there's a set compensation formula. So even if Dr. Brown wasn't terminated under 4.1, he was terminated under 4.4, and at most is entitled to, I think, two days of compensation under that formula. Okay, thank you, counsel. Thank you. All right, let's give him two minutes to – he was over, too, just not as far over, so we'll give him a couple of minutes of rebuttal. Thank you. Judge Murphy, to your point, it does not change the terms of the contract. The contract requires a reasonable determination – that's in quotes, that's their contract language – before a cancellation can be made. That's an objective determination, and that process absolutely requires, in good faith, a discussion with the candidate to find out if they meet the credentialing standard or not. And we did ask multiple witnesses about written credentialing standards. Did you argue this very thing in the Rule 56 – in your papers in the Rule 56 proceeding? I believe we argued that no one talked to him. I can't give you a – well, I can give you a cite. Well, no, if you tell me it's in there, we'll look at your – are the summary judgment papers in the record? They are. Okay. But I'll tell you it's – I'll tell you it's 107 to 109 of the appendix where the witness said no, and that was part of our opposition. I also take Judge Moritz's point that the reasonableness of the standard and the application of the standard do get sort of muddled and blended, and it requires kind of some shadowboxing to figure out exactly what Comp Health wants. Because there are – counsel is correct – there are no written – there's no written description of this credentialing standard. Now, there are general guidelines for – Did you request – did you – I mean, you went through discovery. Did you request the credentials, the written credentials, that they existed? I believe so, and counsel is correct. None were produced. But there are some general guidelines about credentialing, just nothing that explains this recent inpatient credentialing standard. Are your document requests in the record? I don't think so. Okay, so we can't – there's no way for us to know if you asked for them or not. No way to know if we made a written request, but there – we did ask Stephanie Cottle and – Is it in the record? Yes, and the 30B6 witness, and none of them could identify a written explanation of this inpatient experience standard. So you're telling us you asked that question? In the depositions, yes. And are those depositions in the record? They are. Okay. You said there were general credentials. I'm sorry? You said there was something called general – I believe there were general guidelines that talk about how credentialing needs to take place. They're very general. They were administrative things rather than substantive. Absolutely. That's my – And are those general credentialing matters in the record? I don't think so. I didn't include them. But the deposition testimony where I asked about credentialing standards is in the record. Do you remember what witness? I believe it was Stephanie Cottle and Preston Powell and the 30B6 Jeff Snow. Okay. All right. Thank you, Counselor. You're out of time. Okay, thank you. Okay, the case will be submitted. Counsel is excused. And the court will be in recess until 9 a.m. tomorrow morning.